UNITED STATES ex rel. ALCOHOL FOUNDATION, INC., Plaintiff,

v.

KALMANOVITZ CHARITABLE FOUNDATION, INC., Austin Nichols & Co., Inc., Anheuser–Busch, Inc., E&J Gallo, Inc., Fortune Brands, Inc., Beer Institute, Beringer Wine Estates Holdings, Inc., Distilled Spirits Council of the U.S., Inc., Seagram & Sons, Inc., Bacardi–Martini, U.S.A., Wine Institute, Deluca Liquor & Wine, Ltd., S&P Company, Todhunter International, Inc., Heineken U.S.A., Inc., Southern Wine & Spirits of America, Inc., and John Does to be Named, Defendants.

No. 00 CIV. 6267(VM).

United States District Court, S.D. New York.

Feb. 26, 2002.

## DECISION AND ORDER

MARRERO, District Judge.

Alcohol Foundation, Inc. ("Alcohol Foundation") commenced this action by filing a complaint under seal on August 22, 2000, as a relator under the False Claims Act, 31 U.S.C. §§ 3729–33. Alcohol Foundation claims that the defendants have caused misrepresentations and false and/or fraudulent claims to be presented to the government for the treatment of alcohol-related diseases. Pursuant to 31 U.S.C. § 3730, on February 28, 2001, the Office of the Attorney General for the United States of America (the "Government") notified the Court of its decision not to intervene and suggested that the Court lacked subject matter jurisdiction over the complaint. The Government further requested that, except for the complaint, the record in this action remain under seal permanently. Defendants Kalmanovitz Charitable Foundation, Inc., Austin Nichols & Co., Inc., Anheuser Busch, Inc., E&J Gallo, Inc., Fortune Brands, Inc., Distilled Spirits Council of the U.S., Inc., Seagram & Sons, Inc., Bacardi–Martini, U.S.A., Wine Institute, Deluca Liquor & Wine, Ltd., S&P company, Todhunter International, Inc., Heineken U.S.A., Inc., Southern Wine & Spirits of America, Inc. (collectively "De-

fendants") have not yet been notified of this action. Thus, now before the Court is a *qui tam* action filed by Alcohol Foundation, in which the United States will not intervene, and over which this Court has no jurisdiction.

## I. *BACKGROUND*

This action is based on Alcohol Foundation's theory that because the consumption of alcohol can have negative health consequences and because makers and purveyors of alcoholic beverages, such as the Defendants, engage in advertising campaigns, such alcoholic beverage makers and purveyors should be held responsible for the medical costs of treating alcohol-related medical conditions. Alcohol Foundation seeks to show that, by paying the costs of alcohol-related medical treatment, the federal government is being defrauded by Defendants. Under Alcohol

Foundation's theory, the inconsistency between the Defendants' advertising slogans and reality constitutes fraud,[1] and the medical treatment bills paid by the federal government are the claims at issue. By its submission to the United States (the "Government"), Alcohol Foundation seeks to interest the Government in electing to " 'pursue its claim through any alternate remedy available to the Government' " to address its theory. (*See* Memorandum to United States Attorney on Complaint under 31 U..C. [sic] §§ 3729–3733 of the Federal False Claims Act ("Submission"), at 2 (quoting 31 U.S.C. § 3730(c)(5)).)

Alcohol Foundation poses a number of "rhetorical" questions,[2] culminating in one question that essentially summarizes its position: "Does such a mix of *power, money, influence, misleading image* and *lack of disclosure* result in a *common law fraud* on the *federal government*, on the *state*

---

**1.** Specifically, Alcohol Foundations states that:

> The fraud is in the fact that the alcoholic beverage industry has been selling, encouraging and inducing people to buy in quantities sufficient to damage body and brain, what they knew to be a dangerous and addictive substance for most of the 20th century. To date they have not been held to task for the damage caused by their product. They have had little effective incentive to change their marketing practices. And they have completely failed to acknowledge the illness and injuries attributable to alcohol consumption. The fraud continues under the rubric that while the alcohol beverage industry spends over a billion dollars a year selling their products, at the same time they expect to be "shielded" by simply claiming their "policy" is "moderation." ... The alcohol industry [sic] knows that their sizeable political donations have *unduly influenced* legislators both from pursuing serious alcohol related health and liability issues and from their responsibilities to exercise meaningful oversight over both the alcohol beverage industry and over the industry's professed responsibility to the public.

(Compl. ¶¶ 29–30, 36 (emphasis in original).)

**2.** The rhetorical questions appear to enumerate the human failings and regulatory flaws that Alcohol Foundation attributes to the Defendants' conduct. (*See, e.g.,* Submission, ¶ 861 ("Is addiction to a non-health-regulated, legal drug a violation of a consumer's *civil rights* and a form of *involuntary servitude?* ") (emphasis in original); *id.,* ¶ 864 ("Has the alcohol beverage industry conspired among its member to reduce its liability exposure and protect its franchise by at the same time presenting one image to the public while keeping another very different reality of harm to the health of its consumers concealed?"); *id.,* ¶ 866 ("Does the alcohol beverage industry present its product to the public using an image of good times with consumption, and does it present itself with an industry policy of no drinking and driving, while at the same time and while out of public scrutiny it fights legal reform to reduce the per se blood alcohol levels for drunk driving, and it fights the meaningful and effective beverage alcohol warning labels? Does the alcohol beverage industry through its trade organizations and lobbyists deliberately mislead the public and Congress at the cost of the health and welfare of the public?").)

*governments,* on *charities,* on *insurance,* on *individuals,* and on the *public?*" (Submission, ¶ 868 (emphasis in original).)

Alcohol Foundation suggests that an affirmative answer to its question is the only logical response. (*See* Plaintiff's Response (to Government Notice Declining Election and Suggestion of Dismissal) and Request for Relief ("Pl.'s Mem.") at 2.) It further asserts that it has standing to bring this action as a relator under the False Claims Act because of the work it did in researching and compiling scientific and government publications in order to answer its question in the affirmative.

The Government indicated that, after its review of the Submission, it decided not to intervene in the action. (*See* Notice of Election to Decline Intervention and Suggestion of Dismissal, dated February 28, 2001.) As a non-party, the Government brought the issue of subject matter jurisdiction to the Court's attention by suggestion.

Alcohol Foundation opposed the Government's decision not to elect to intervene, its suggestion that the Court lacks subject matter jurisdiction and its request that the matter remain under seal permanently. (*See* Pl.'s Mem.) In response, the Court extended the seal period in order to permit Alcohol Foundation to update its disclosure materials. At a conference before the Court on February 4, 2002, Alcohol Foundation updated the Submission to the United States and the Court. Nevertheless, at the February 4, 2002 conference, the United States represented that it would not change its decision not to intervene based on Alcohol Foundation's new submission.

## II. *DISCUSSION*

■ It is axiomatic that federal courts are of limited jurisdiction; this Court's jurisdiction is defined by the United States Constitution and federal legislation. Accordingly, this Court must police jurisdic-

tional issues promptly and closely. *See Ruhrgas AG v. Marathon Oil Co.,* 526 U.S. 574, 583, 119 S.Ct. 1563, 143 L.Ed.2d 760 (1999) (citing Fed.R.Civ.P. 12(h)); *Lyndonville Savings Bank & Trust Co. v. Lussier,* 211 F.3d 697, 700 (2d Cir.2000) ("[F]ailure of subject matter jurisdiction is not waivable and may be raised at any time by a party or by the court *sua sponte.*"); *Creaciones Con Idea, S.A. de C.V. v. MashreqBank, S.A. de C.V.,* 75 F.Supp.2d 279, 280–81 (S.D.N.Y.1999) (*sua sponte* dismissal for lack of subject matter jurisdiction under 28 U.S.C. § 1332).

The False Claims Act defines the jurisdiction of a federal court over *qui tam* claims. *See* 31 U.S.C. § 3730. According to 31 U.S.C. § 3730(e)(4), this Court has no jurisdiction if the information giving rise to the *qui tam* claim was subject to public disclosure through "a criminal, civil, or administrative hearing, in a congressional, administrative, or Government [General] Accounting Office report, hearing, audit, or investigation, or from the news media" unless the individual bringing suit is the United States Attorney General or qualifies as the "original source" of the information. *Id.* There is no dispute in this case that the factual information on which Alcohol Foundation bases its *qui tam* action was gleaned from third parties' published articles.

The Government contends that Alcohol Foundation's allegations were publicly disclosed prior to the commencement of this *qui tam* action and that Alcohol Foundation is not the original source of the allegations. Alcohol Foundation maintains that while the facts were publically disclosed, the allegation of fraud is entirely new. As Alcohol Foundation explained during oral argument on February 4, 2002, its allegations arise out of the "perspective" that Alcohol Foundation's members obtained by spending hundreds of hours compiling facts into a "mosaic." Thus, the Court

must answer the question of whether Alcohol Foundation's efforts transformed itself into an "original source" for purposes of bringing a *qui tam* action.

To be an original source, the individual must have had "direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the government before filing an action under this section which is based on the information." 31 U.S.C. § 3730(e)(4)(b). If Alcohol Foundation does not qualify as an "original source" of the information it has submitted to the Government, the court lacks subject matter jurisdiction. In that situation, the court must dismiss the matter pursuant to Fed.R.Civ.P. 12(h).

■ The decision and analysis of subject matter jurisdiction in *Kreindler v. United Technologies Corp.*, 985 F.2d 1148 (2d Cir. 1993), is binding authority in this case. In *Kreindler*, the Second Circuit adopted the Third Circuit's reasoning, as expressed in *United States Ex. Rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Insurance*, 944 F.2d 1149, 1155–56 (3d Cir. 1991), that § 3730(e)(4) was " 'designed to preclude *qui tam* suits based on information that would have been equally available to strangers to the fraud transaction had they chosen to look for it as it was to the relator.' " The relator in *Kreindler* had obtained pertinent information from discovery material publically disclosed in a separate lawsuit and from its own, "independent investigation." The relator argued that its "independent investigation" gave it subject matter jurisdiction as an "original source." The Second Circuit rejected this argument, and followed the Tenth Circuit's position articulated in *United States ex rel. Precision Co. v. Koch Industries*, 971 F.2d 548, 552–53 (10th Cir. 1992), that a *qui tam* action cannot be based " 'in any part upon publicly disclosed allegations or transactions.' " Accordingly,

as *Kreindler* is understood and applied in this District, to establish itself as an original source:

> a *qui tam* plaintiff must: (1) have direct and independent knowledge of the information on which the allegations are based; (2) have voluntarily provided such information to the government prior to filing suit; and (3) have directly or indirectly been a source to the entity that publicly disclosed the allegations on which the suit is based.

*United States ex rel. DeCarlo v. Kiewit/AFC Enterprises, Inc.*, 937 F.Supp. 1039, 1048 (S.D.N.Y.1996) (citing *Kreindler*, 985 F.2d at 1158–59).

More recently, the Second Circuit affirmed the dismissal of a *qui tam* suit because the relators were not original sources of the information, even though they had conducted their own, additional investigation. *See United States Ex Rel. Dhawan & Gowie v. New York Medical College*, 252 F.3d 118, 121 (2d Cir.2001). In *Dhawan & Gowie*, the fact of a fraud had been revealed by two prior audits conducted by a third party. The relator's independent, subsequent audit was merely to confirm and quantify the fraud, and did not satisfy § 3730(e)(4)'s "original source" requirement.

Although the court in *Kreindler* lacked subject matter jurisdiction because the relator gained some information from the public disclosures made as part of discovery in a prior litigation, the *Kreindler* logic applies equally well to the situation where a relator acquires pertinent information from "the news media." For instance, the Second Circuit held that a *qui tam* action was barred where the relator had learned of the particular alleged fraud through a newspaper article. *See United States Ex Rel. Dick v. Long Island Lighting Co.*, 912 F.2d 13 (2d Cir.1990). Similarly, the Circuit Court found subject matter jurisdiction absent where the relator obtained its

information from arbitration proceedings, draft administrative reports and learned of the fact of the fraud through articles in a regional newspaper and an engineering periodical. *See Gold v. Morrison–Knudsen,* 68 F.3d 1475 (2d Cir.1995).

■ Alcohol Foundation argued that the scientific and scholarly works from which it developed the Submission are too technical for the average member of the public to understand and are distributed to a reader base that is smaller and professionally specialized. Thus, in Alcohol Foundation's view, such publications cannot constitute a public disclosure through the "news media" under 31 U.S.C. § 3730. This Court notes that the ordinary meaning of the statutory term "news media," would encompass the publication of information in scholarly or scientific periodicals. No different from newspaper reporters, scholarly and scientific authors also disseminate information to the public in a periodic manner. As Alcohol Foundation acknowledged at oral argument, such sources are as generally accessible to any other strangers to the fraud as would be a newspaper article. *See United States ex rel. Pentagen Technologies Int'l, Ltd. v. CACI Int'l Inc.,* No. 94 Civ. 2925, 1996 WL 11299, *8 (S.D.N.Y. Jan.4, 1996) ("The papers were in the public domain not because the public at large knew of the papers and the contents, but because filing with the court meant that any stranger to the fraud could access them as could the relator.") (citing *Kreindler,* 985 F.2d at 1158). No principle of statutory construction or public policy would compel a cramped reading of the term "news media" or the imposition of a judicially created limit of "news media" to encompass only the newspaper context. *See, e.g., A–1 Ambulance Service, Inc. v. State of California,* 202 F.3d 1238, 1244 (9th Cir.2000) (rejecting the use of a

"cramped" reading of the term "legislative hearing" in § 3730(e)(4)).

■ To summarize, then, if a third party first distributed information through any of the *fora* identified in § 3730(e)(4)(a), and a putative relator relied on that information in bringing a *qui tam* suit, a federal court lacks subject matter jurisdiction over the suit. In this case, based on its review of the material Alcohol Foundation has submitted for consideration, the Court concludes that the information collected and compiled by Alcohol Foundation had previously been prepared and made generally accessible to the public by third parties.

It is Alcohol Foundation's position that it has direct and independent information based on its creation of the "mosaic" of information that shows a fraud on the United States and that an average member of the public could neither understand the information available in the news media nor perceive a fraud absent Alcohol Foundation's compilation.

The Court does not find in the Submission that Alcohol Foundation's recitation of various facts and figures related to the marketing, consumption and regulation of alcoholic beverages transforms Alcohol Foundation into an "original source." Critically, the facts of the fraud claimed by Alcohol Foundation, that every year the federal government spends money treating alcohol-related medical conditions and consequences, has already been identified in reports issued by and for the federal government itself. (*See* Submission, ¶¶ 17–21, 25–27, 51, 108, 123, 191, 368, 376–79, 396, 414, 643, 650, 732.) Alcohol Foundation essentially admits that its related observation, that the alcohol industry has no financial incentive to curtail abusive alcohol consumption, is self-evident.[3] On the basis of

---

**3.** Alcohol Foundation concedes that its efforts merely emphasize this point: "This report

points out clearer than it has ever been point-

its two observations, and by virtue of its allegedly unique perspective,[4] Alcohol Foundation alleges that there is a conspiracy among the alcoholic beverage producers and marketers to defraud the public and Government and to deprive citizens of their civil rights. *See supra* note 2.

■ The persuasiveness of Alcohol Foundation's argument would depend upon an unprecedented, expansive reading of the term "false or fraudulent claim." Under the False Claims Act, liability is imposed on one who (1) "knowingly presents, or causes to be presented, to . . . the United States Government . . . a false or fraudulent claim for payment or approval," (2) "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government," or (3) "conspires to defraud the Government by getting a false or fraudulent claim allowed or paid." 31 U.S.C. § 3729(a)(1)-(3); *see also United States ex rel. Mikes v. Straus*, 84 F.Supp.2d 427, 432 (S.D.N.Y.1999).

Alcohol Foundation's conclusory and seemingly doctrinal allegations of liability under the False Claims Act require the reader to make numerous inferences. In particular, Alcohol Foundation does not specify what or whose particular false or fraudulent claims deriving from Defen-

dants were submitted to the Government for payment or approval.[5] Thus, Alcohol Foundation's theory seeks to expand the definition of the statutory term to address a generic definition of "fraud" without direct link to specific claims submitted to the Government for approval or payment. This definition would enlarge the *qui tam* mechanism to address all manner of misrepresentations, without link to federal statute or a particular state's common law, if ultimately it might result in the federal Government's payment of a bill. Such a result would effectively eliminate any concept of proximate causation from litigation under the False Claims Act. Regardless of what theorists might opine about the hegemonic market powers at play, as a legal matter, the showing made by Alcohol Foundation cannot satisfy the requirements of 31 U.S.C. § 3730. Thus, this Court concludes that it lacks subject matter jurisdiction in this matter and the case must be dismissed.

■ This outcome is consistent with the policies underlying the *qui tam* procedure. Congress enacted the False Claims Act to create an incentive for civic-minded whistle-blowers, that is, insiders who put their personal employment or other interests at risk in order to vindicate the pecuniary rights of the United States. *See Krein-*

---

ed out previously that the alcohol beverage industry in the United States relies on binge drinkers and addicted drinkers for the bulk of its profits. The report clearly sets forth how a small percentage of beverage alcohol drinkers drink the vast bulk of alcoholic beverages." (Submission, ¶ 818.)

4. Alcohol Foundation describes its perspective as unique in that: "To understand the scope of the problem and the depth of the fraud one must understand concepts of time, statistics, science, politics, and the law." (Submission, ¶ 141.) However, the perspective gained from the foregoing combination of skills is easily distinguished from that of the archetypal whistle-blower who is an insider to

corporate wrongdoing because one is merely a perceptive third-party while the other has firsthand knowledge of the wrong and its perpetrators.

5. Although Alcohol Foundation clearly has aspirations for Defendants, and enumerates Defendants' shortcomings, the complaint does not illuminate with regard to the Defendants' fraud as a legal matter. Thus, the complaint provides neither the whistle-blowing information a *qui tam* relator is expected to disclose, nor a short and plain statement of the claim as required by Fed.R.Civ.P. 8, nor the pleading of fraud with the particularity demanded by Fed.R.Civ.P. 9(b).

*dler*, 985 F.2d at 1157–58; S.Rep. No. 99–345 (1986), at 5, 8–10. At the same time, Congress intended to bar opportunistic persons from abusing the *qui tam* procedure for self aggrandizement. *See Kreindler* (citing 31 U.S.C. § 3730(e)(4)); S.Rep. No. 99–345 (1986), at 2, 8–10. There is no indication that Congress intended for the *qui tam* procedure to be available to those pursuing a less pecuniary and more expansive social agenda.[6] Thus, even if Alcohol Foundation is not motivated by the prospect of a share in any ultimate pecuniary recovery, Alcohol Foundation's public-interest spirit falls outside the narrower purpose contemplated by the statute.

■■■ Finally, the Government requested that, except for the complaint, the matter remain under seal permanently pursuant to 31 U.S.C. § 3730(b)(3) which permits the government "for good cause shown, move the court for extensions of the time during which the complaint remains under seal." Such a motion "may be supported by affidavits or other submissions in camera." *Id.* Judicial records presumptively are to be made available to the public. *See United States v. Amodeo*, 71 F.3d 1044, 1047–51 (2d Cir.1995). The weight of the presumption varies according to the document at issue and "is at its strongest when the document in question, as here, has been submitted as a basis for judicial decision making." *Greater Miami Baseball Club Limited Partnership v. Selig*, 955 F.Supp. 37, 39 (S.D.N.Y.1997); *Amodeo*, 71 F.3d at 1048–49. By contrast, the presumption is particularly weak if the document plays "no role in the performance of Article III functions, such as those passed between the parties in discovery." *Amodeo*, 71 F.3d at 1048. The party requesting that a matter be filed and kept under seal bears the burden of showing why the material should be kept from public view. *See DiRussa v. Dean Witter Reynolds, Inc.*, 121 F.3d 818, 826 (2d Cir.1997). Here, the presumption in favor of public access is at its peak because the documents at issue were submitted to and used by the Court in rendering this Decision. Nevertheless, the Government's conclusory request did not provide the Court with a showing of "good cause" or any other rationale for keeping the official record under seal. Thus, the Court denies the Government's request that the matter remain under seal.

### III. *ORDER*

For the foregoing reasons, it is hereby

**ORDERED** that the Clerk of Court unseal this case; and it is further

**ORDERED**, that the complaint is dismissed; and it is finally

---

**6.** It appears that Alcohol Foundation is motivated to change and improve society, indisputably a commendable end. However, Alcohol Foundation seeks to effectuate its aspirations through adjudication in this Article III Court. In its own words, Alcohol Foundation explains that:

> [T]his lawsuit is in part about marshaling any of those good intentions that there may be, any of those social responsibilities, any of those social contracts and those profits, and building on them, to set forth a legally binding uniform standard of social responsibility requiring a certain percentage of each sale of alcoholic beverage to be set aside to cover the costs incurred for (1) meaningful educational and prevention programs for both the general population and "special populations," (2) "on demand" treatment and recovery programs for people who are addicted, and (3) "on demand" treatment and education programs for people (like fetal alcohol syndrome babies) suffering from other physiological problems caused by alcohol use and abuse.

(Submission, ¶ 14.)

ORDERED that the case is closed.

SO ORDERED.